**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gordon W. FRANKLIN, Frederick J.
Bonomo, Gerald A. Pini,
Defendants-Appellants.**

No. 78–5056.

United States Court of Appeals,
Fifth Circuit.

Dec. 20, 1978.

Rehearing Denied Jan. 22, 1979.

Michael Doddo, Miami, Fla. (Court appointed), for Franklin.

Alfred Paul Farese, Everett, Mass., for Bonomo.

Dennis J. Sullivan, Joseph Delcore, Everett, Mass, for Pini.

Jack V. Eskenazi, U. S. Atty., C. Wesley G. Currier, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before JONES, AINSWORTH and HILL, Circuit Judges.

AINSWORTH, Circuit Judge:

Gerald Pini, Frederick Bonomo [1] and Gordon Franklin appeal their convictions on charges of transporting stolen goods in interstate commerce, knowing the same to have been stolen, in violation of 18 U.S.C. § 2314,[2] and of violating 18 U.S.C. § 371 [3] by conspiring to violate 18 U.S.C. § 2314, asserting numerous errors in their trial. The

---

1. We adopt the spelling "Bonomo," which was used in the indictment, although the transcript and appellant's brief spell the name "Bonamo."

2. 18 U.S.C. § 2314 provides in pertinent part: Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; . . . Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

3. Under 18 U.S.C. § 371,
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

contentions that Bonomo and Pini advance are meritless and we therefore affirm their convictions. However, we find insufficient evidence to support Franklin's convictions and reverse.

## I. Factual Background

Appellants were indicted and convicted for their alleged participation in a plot, organized by one Francis de Forrest Van Zandt, to steal four "elephant folios" of John James Audubon bird prints, containing 435 prints worth a total of more than $400,000, from the Audubon House in Key West, Florida. Pini and Bonomo arrived in Key West, Florida, from Boston on Wednesday, May 25, 1977, two days before the Audubon House was burglarized. According to the testimony at trial of Van Zandt's accountant, Roy Louis Morrell, Jr., a coconspirator who testified for the Government, both Pini and Bonomo were among those attending a meeting on Thursday, May 26, at the Pier House Motel. There, Van Zandt and the others went over the plans for the burglary, discussed the subsequent disposition of the Audubon prints, and determined the role of each participant in the proposed theft. Bonomo's task was to pick the lock of the Audubon House and disable the alarm system, while Pini and another man would break into the case containing the elephant folios and carry the prints from the building.[4] Morrell testified that after this meeting, the plotters went to the Audubon House, intending to commit the theft; however, the sound of an alarm and the fear that someone remained inside the building led them to withdraw.

They returned the next evening, Friday, May 27, and carried out the burglary. Morrell related that Bonomo went toward Audubon House and returned shortly thereafter, saying "I've done my job, now the others will have to do theirs." Pini took a crowbar from the back seat of the car from which Morrell was keeping watch and headed for the building. A short time passed and Pini came back, explaining that the crowbar was too large to pry open the folios' case and saying that he needed a screwdriver. Pini and Van Zandt drove off in the lookout car, according to Morrell, returning in approximately 25 minutes with a screwdriver that Pini then carried toward the House. After a short while, Pini came back out to get Van Zandt, explaining that the folios were too heavy for two men to carry; Van Zandt went in to assist. About 20 minutes later, Van Zandt left the building and made a phone call, and approximately 10 minutes after that another participant, Tim Jones, pulled up in a pickup truck. Van Zandt and Pini loaded the folios into the back of the truck, which Jones then drove off, and Van Zandt took Pini and Morrell in the lookout car back to his condominium.[5]

The next morning, following Van Zandt's instructions, Morrell drove to the warehouse to which Jones had taken the stolen art and asked appellant Gordon Franklin, who worked there, "if everything was okay." Franklin replied, "Yes." On Sunday, May 29, Kester Buchanan arrived in Key West. Buchanan testified that Van Zandt had called him on Friday afternoon at his home in North Carolina, describing an "emergency" and asking him to come to Key West "immediately" and that in response to Buchanan's request for funds Van Zandt ordered Morrell to send him a telegraphic money order.

According to Buchanan's testimony, on Monday morning, May 30, he conferred with Van Zandt, Morrell and Jones. The four then drove to the warehouse, and appellant Franklin helped them load the folios, now wrapped in green plastic, into the trunk of Buchanan's car. Jones and Van Zandt took a separate automobile to Miami, followed by Buchanan, who continued on to his home in North Carolina, there to await

---

4. During his testimony, Morrell identified a photograph of Joseph Collaro as the man who was to accompany Pini into the building. Collaro was tried separately, after the trial of appellants, and acquitted of both the substantive charge and the conspiracy offense.

5. According to Morrell, the man he identified as Collaro also helped load the prints into the truck and accompanied the others back to Van Zandt's condominium.

further instructions. On the stand, Buchanan recounted Van Zandt's telephone call approximately 5 days later asking him to take the prints to New York. When Buchanan replied that he was unavailable, Van Zandt sent Morrell to pick up the folios and transport them northward. Morrell was later apprehended in New Jersey with one of the folios in his possession and he subsequently pled guilty in a federal court in New Jersey to the charge of interstate transportation of stolen property, receiving a sentence of five years' probation. Buchanan pled guilty in the United States District Court for the Southern District of Florida, the same court where these appellants were tried, to a charge of conspiring to transport stolen property in interstate commerce and was awaiting sentencing at the time of his testimony at the trial.

Appellants Pini, Bonomo and Franklin were indicted and tried along with Tim Jones, among others.[6] The jury found the four men guilty of violating the substantive provisions of 18 U.S.C. § 2314, as well as conspiring under 18 U.S.C. § 371 to violate section 2314. Bonomo and Pini each received concurrent sentences of seven years for the substantive crime and three years for the conspiracy offense. Franklin was sentenced to concurrent terms of seven years on the substantive conviction and four years for the conspiracy charge.[7]

## II. The Claims of Bonomo and Pini

### A. Sufficiency of the Evidence

Pini and Bonomo first claim that the district court erred in denying their motions for judgments of acquittal, since the evidence was insufficient to support a guilty verdict on either the substantive offense or the conspiracy charge. We disagree, as the record plainly demonstrates the presence of sufficient evidence to sustain appellants' convictions under both counts of the indictment.

### 1. The Substantive Offense

In challenging their convictions for the substantive offense, appellants stress the absence of any evidence that they took part in or facilitated the interstate transportation of the stolen art. Essentially, they contend that their participation ended with the burglary itself, and therefore that they cannot have violated 18 U.S.C. § 2314.

That statute provides in pertinent part that "[w]hoever transports in interstate or foreign commerce any goods, . . . knowing the same to have been stolen, . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both." We follow the unvarying lead of our fellow circuits in holding that to establish a substantive violation of section 2314 the Government need only show knowledge that the goods were stolen, "together with the actual fact that they were transported interstate." *United States v. Kilcullen*, 1 Cir., 1976, 546 F.2d 435, 445 n.15, *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582; *United States v. Cowden*, 1 Cir., 1976, 545 F.2d 257, *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585; *United States v. Wilson*, 8 Cir., 1975, 523 F.2d 828, *cert. denied*, 434 U.S. 849, 98 S.Ct. 158, 54

---

**6.** Also indicted were Van Zandt, Collaro, and Susan Sousa who, according to Morrell, had been in the lookout car with him during a portion of the burglary. The district court granted the motion of Sousa's counsel for a judgment of acquittal. As previously noted, Collaro was tried separately and acquitted. Because Van Zandt's lawyer was involved with another case and thus unavailable at the time of trial, the court granted Van Zandt's motion for severance. He was convicted on both counts of the indictment at his subsequent trial.

**7.** Jones was committed to the custody of the Attorney General for treatment and supervision pursuant to the Federal Youth Corrections Act,

18 U.S.C. § 5010(b), as extended by 18 U.S.C. § 4216, until discharged by the United States Parole Commission as provided in 18 U.S.C. § 5017(c). Section 5017(c) provides that "[a] youth offender committed under § 5010(b) of this chapter shall be released conditionally under supervision on or before the expiration of four years from the date of his conviction and shall be discharged unconditionally on or before six years from the date of his conviction." Jones originally appealed his conviction, but dropped the action in exchange for government "accommodation" to his motion for resentencing to a definite term as an adult offender.

L.Ed.2d 117; *United States v. Ludwig*, 8 Cir., 1975, 523 F.2d 705, 707; *United States v. White*, 6 Cir., 1971, 451 F.2d 559, 559–60, cert. denied, 405 U.S. 1071, 92 S.Ct. 1522, 31 L.Ed.2d 804 (1972); *United States v. Mingoia*, 2 Cir., 1970, 424 F.2d 710; *United States v. Kierschke*, 6 Cir., 1963, 315 F.2d 315, 317, 318; *United States v. Tannuzzo*, 2 Cir., 1949, 174 F.2d 177, 180.[8] *See United States v. Kelly*, 5 Cir., 1978, 569 F.2d 928, 934.

Though the plain language of section 2314 requires knowledge that the goods were stolen, it imposes "no requirement . . . that the accused know, foresee, or intend that instrumentalities of interstate commerce will be used." *United States v. Powers*, 9 Cir., 1971, 437 F.2d 1160–1161. This is so because the statute "is aimed at the evils of theft, fraud, and counterfeiting and not at the regulation of interstate transportation. Suppression of movement of the fruits of theft and fraud is only the means to the end of suppressing theft and fraud themselves. The sole reason for conditioning the statutes' prohibitions upon use of interstate commerce is to provide a constitutional basis for the exercise of federal power." *United States v. Roselli*, 9 Cir., 1970, 432 F.2d 879, 891, cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). Accordingly, whether Pini or Bonomo assisted or was aware of the actual interstate shipment of the Audubon folios has no bearing on the validity of their convictions for the substantive offense.[9]

■ Viewing "the evidence and all reasonable inferences flowing therefrom in the light most favorable to the Government," *United States v. Cadillac Overall Supply Co.*, 5 Cir., 1978, 568 F.2d 1078, 1084; *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we find sufficient evidence to support appellants' convictions on the substantive charge. The actual fact that the stolen prints were transported interstate stands uncontroverted, and both Pini and Bonomo concede not only knowledge of the prints' stolen character but also participation in the actual theft.

## 2. The Conspiracy Charge

■ Appellants Pini and Bonomo contend also that "there was insufficient evidence, either direct or circumstantial to show that they were members of a conspiracy, the purpose of which was to transport stolen

---

8. This court has taken the same approach in dealing with two analogous statutes. In *United States v. Doolittle*, 5 Cir., 507 F.2d 1368, cert. denied, 423 U.S. 1008, 96 S.Ct. 439, 46 L.Ed.2d 380 (1975), the appellants had been convicted of using interstate wire and telephone facilities to carry on illegal gambling operations, in violation of 18 U.S.C. § 1952. The district court had "specifically found that two defendants lacked actual knowledge of the use of interstate facilities in the gambling operation." The *Doolittle* court concluded that "this lack of specific knowledge is legally irrelevant. The words of section 1952 do not require specific knowledge of the use of interstate facilities and we agree with the decisions in other Circuits that such knowledge is not a prerequisite to criminal liability thereunder." *Id.* at 1372. Similarly, in *Nelson v. United States*, 5 Cir., 1969, 415 F.2d 483, the defendant was convicted of receiving stolen property in violation of 18 U.S.C. § 2113(c), which prohibits the receipt or possession of any property or money "knowing the same to have been taken from a bank." Section 2113(f) defines "bank" to include all financial institutions whose deposits are insured by the Federal Deposit Insurance Corporation. Although the evidence showed that the defendant knew that the money he received had been stolen from a bank, the *Nelson* court asked "whether it must be shown that the appellant knew the additional fact[ ] . . . that the bank was FDIC insured" and answered in the negative: "[p]roving that the bank was insured by the FDIC is simply an additional element of jurisdictional proof which must be shown by the Government at the trial." *Id.* at 486.

9. Unlike the current language of section 2314, an earlier version of the statute referred to persons "causing or procuring" the interstate transportation of stolen property. This language was later "omitted as unnecessary" in view of 18 U.S.C. § 2 and its definition of "principal." Historical and Revision Notes, 18 U.S.C.A. § 2314. 18 U.S.C. § 2 provides that anyone who "aids, abets, counsels, commands, induces or procures" the commission of an offense against the United States "is punishable as a principal." Although the indictment made no mention of section 2, at the Government's request the district court instructed the jury at trial's end that the defendants were also charged with having violated its provisions.

goods in interstate commerce." This contention must also fail, as we reject appellants' assumption that, to prove a conspiracy under 18 U.S.C. § 371 to violate section 2314, the Government had to establish knowledge on the part of Bonomo and Pini that the Audubon folios were to be transported interstate. Instead, we adopt the well-established view that knowledge of the jurisdictional element—here, the interstate shipment of the stolen goods—"is as irrelevant to the purposes of the general conspiracy statute as it is to the purposes of the substantive statutes." *United States v. Roselli, supra,* 432 F.2d at 892.

On its face, the federal conspiracy statute [10] does not support "the proposition that to be guilty of conspiracy a defendant in effect must have known that his conduct violated federal law." *United States v. Feola,* 420 U.S. 671, 687, 95 S.Ct. 1255, 1265, 43 L.Ed.2d 541 (1975). Rather than add any essential elements to substantive statutes, the conspiracy law merely prohibits "an agreement by two or more persons to commit the substantive crime[s]." *United States v. Roselli, supra,* 432 F.2d at 891; *United States v. Feola, supra,* 420 U.S. at 687, 95 S.Ct. at 1265. In *United States v. Feola,* the Supreme Court held that knowledge of the fact establishing federal jurisdiction, in that case that the victim of one's assault was a federal officer, was not a necessary element of a conspiracy under section 371 to violate 18 U.S.C. § 111, which prohibits an assault on a federal officer while he is engaged in his official duties. The Court reasoned that requiring knowledge of the jurisdictional element would not serve the two main values expressed in our law of conspiracy. 420 U.S. at 963, 95 S.Ct. at 1268. Writing for the *Feola* majority, Justice Blackmun identified as the first of these values the "protection of society from

the dangers of concerted criminal activity." He observed "[t]hat individuals know that their planned venture violates federal as well as state law seems totally irrelevant" to this purpose of conspiracy law and concluded that "the act of agreement to commit the crime is no less opprobrious and no less dangerous because of the absence of knowledge of a fact unnecessary to the formation of criminal intent." *Id.* As articulated in *Feola,* the second value underlying our conspiracy law relates to the inchoate nature of conspiracy. At some point between the mere preparation and actual consummation of a crime, the likelihood of the act's commission is great enough and the criminal intent so developed as to "warrant[ ] preventive action," and the law of conspiracy marks the agreement to participate in criminal activity "as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it . . ." *Id.* The Supreme Court reiterated that "we fail to see how the agreement is any less blameworthy or constitutes less of a danger to society solely because the participants are unaware which body of law they intend to violate," and declared "that imposition of a requirement of knowledge of those facts that serve only to establish federal jurisdiction would render it more difficult to serve the policy behind the law of conspiracy without serving any other apparent social policy." *Id.* 95 S.Ct. at 1269.

We find persuasive the *Feola* analysis [11] and the reasoning of the Ninth Circuit's earlier decision in *United States v. Roselli, supra,* which, like this case, involved an alleged conspiracy to violate section 2314. Therefore, we hold that knowledge of the facts establishing federal jurisdiction is not a necessary element of the crime of

**10.** 18 U.S.C. § 371 makes it unlawful when "two or more persons conspire . . . to commit any offense against the United States . . ., and one or more of such persons do any act to effect the object of the conspiracy . . ."

**11.** Though the issue in *Feola* was limited to the application of section 371 to 18 U.S.C. § 111,

the Court stated a broad holding, declaring "that where knowledge of the facts giving rise to federal jurisdiction is not necessary for conviction of a substantive offense embodying a *mens rea* requirement, such knowledge is equally irrelevant to questions of responsibility for conspiracy to commit that offense." 420 U.S. at 696, 95 S.Ct. at 1269.

conspiracy under 18 U.S.C. § 371 to violate section 2314.[12] *Accord: United States v. Anderson,* 9 Cir., 1976, 532 F.2d 1218, 1230, *cert. denied,* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107; *United States v. Newson,* 10 Cir., 1976, 531 F.2d 979, 981; *United States v. Greer,* 7 Cir., 1972, 467 F.2d 1064, 1071, *cert. denied,* 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). *See United States v. Viruet,* 2 Cir., 1976, 539 F.2d 295, 297 (knowledge of fact that hijacked truck was moving in interstate commerce not an essential element of conspiracy to violate 18 U.S.C. § 659, which prohibits the unlawful taking, with intent to convert to one's own use, of goods moving as an interstate shipment of freight); *United States v. Lefaivre,* 4 Cir., 1974, 507 F.2d 1288, 1299, *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975) (knowledge that interstate facilities were used not a necessary element of conspiracy to violate 18 U.S.C. § 1952, which prohibits interstate travel or the use of interstate facilities, including the mails, to engage "in aid of racketeering enterprises"); *United States v. Falco,* 9 Cir., 1973, 478 F.2d 1376, 1378 (knowledge that stolen property belonged to the Govern-

ment unnecessary to support conviction for conspiracy to violate 18 U.S.C. § 641, which prohibits the knowing conversion or unauthorized sale of any "thing of value of the United States").[13]

Unless we believe that "the jury must necessarily have had a reasonable doubt," *United States v. Warner,* 5 Cir., 1971, 441 F.2d 821, 825, *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971), regarding one of the essential elements of the conspiracy, we cannot conclude that the evidence was insufficient to support the guilty verdicts the jury returned against Bonomo and Pini under the second count of the indictment. First, the Government must have shown the existence of the conspiracy: "an agreement by two or more persons to combine efforts for an illegal purpose." *Id.; United States v. Bright,* 5 Cir., 1977, 550 F.2d 240, 241. After once again viewing the evidence in the light most favorable to the Government, we find that the jury need not have had a reasonable doubt as to whether the conspiracy existed. Once that element is established, the connection of each defendant to the conspiracy must be demonstrated. *United States*

---

**12.** Moreover, although we decide today that knowledge of the fact of interstate transportation is irrelevant to guilt under either section 2314 or section 371 as applied to that substantive provision, we note in passing a further detail of witness Morrell's testimony. Morrell said that it was mentioned at the May 26 Pier House meeting that the Audubon folios would be going "up north" after the robbery. The jury could reasonably infer from this testimony that Bonomo and Pini, both of whom attended the meeting, knew that the stolen art would be transported interstate.

**13.** Our disposition of this issue not only follows the holding in *Feola* and agrees with all available direct authority, but also comports with this court's decisions in at least four analogous areas. *Nelson v. United States,* 5 Cir., 1969, 415 F.2d 483, involved a defendant convicted of both the substantive offense of violating 18 U.S.C. § 2113(c) and conspiracy under section 371. Section 2113(c) makes unlawful the receipt or possession of any property or money, "knowing the same to have been taken from a bank," which section 2113(f) defines to include all financial institutions whose deposits are insured by the Federal Deposit Insurance Corporation. The *Nelson* court concluded that the Government need not show knowledge on the part of the defendant of the bank's federally

insured status since "[p]roving that the bank was insured by the FDIC is simply an additional element of jurisdictional proof which must be shown by the Government at the trial." 415 F.2d at 486. Likewise, in *United States v. Muncy,* 5 Cir., 1976, 526 F.2d 1261, we applied the reasoning of *Feola,* concluded that "[i]nterstate transportation is a jurisdictional element" of 18 U.S.C. § 2315, which prohibits the receipt of stolen goods that are a part of or moving in interstate commerce, knowing them to have been stolen, and announced that "knowledge of jurisdictional facts is not required in determining guilt of either the substantive offense or the conspiracy offense." *Id.* Finally, in two cases dealing with the Dyer Act, 18 U.S.C. §§ 2312, 2313, which prohibits the transportation of motor vehicles in interstate commerce and the receipt, concealment or storage of vehicles that are a part of interstate commerce, with knowledge that the vehicles were stolen, we held that proof of knowledge that the vehicles moved in interstate commerce was unnecessary to support a conviction for conspiracy to violate the Act. *United States v. Beil,* 5 Cir., 1978, 577 F.2d 1313, 1315; *Gurleski v. United States,* 5 Cir., 1968, 405 F.2d 253, 269, *cert. denied,* 395 U.S. 981, 89 S.Ct. 2140, 23 L.Ed.2d 769 (1969).

*v. Warner, supra,* 441 F.2d at 830; *United States v. Bright, supra,* 550 F.2d at 242. Here, there is ample evidence connecting both Pini and Bonomo to the conspiracy. Morrell testified that both men attended the meeting that planned the burglary and determined the assignment of each conspirator; he also described their participation in both the abortive attempt and the actual burglary. Finally, the Government was required to show beyond a reasonable doubt that each defendant "intentionally did some act or thing to further or carry on" the conspiracy. *Causey v. United States,* 5 Cir., 1965, 352 F.2d 203, 207. However, "once it is shown that a particular defendant joined the conspiracy, the acts of his co-conspirators done in furtherance of the conspiracy are attributable to him and he becomes equally liable for them." *United States v. Warner, supra,* 441 F.2d at 830. Admitted coconspirators Buchanan and Morrell acknowledged in their testimony the commission of two of the overt acts alleged in the indictment: that Morrell had sent a telegraphic money order to Buchanan and that Buchanan had transported the stolen prints in the trunk of his car from Key West to North Carolina. Again, we do not believe that the jury need have had any reasonable doubt regarding the commission of these overt acts. Because we cannot say that the jury must necessarily have entertained a reasonable doubt with regard to any essential element of the crime, we conclude that the conspiracy convictions of Bonomo and Pini are supported by sufficient evidence.

B. Admission of Coconspirators' Declarations Into Evidence; Sufficiency of the Evidence

 Appellants Pini and Bonomo next attack the district court's admission of the hearsay declarations of their coconspirators, which included the conversation at the Pier House meeting and remarks made during the commission of the actual burglary, claiming that there was insufficient independent evidence of their participation in the conspiracy to allow these statements to go to the jury and contending that the trial judge gave the jury a fatally flawed instruction on the admissibility of coconspirators' declarations into evidence.

The challenge to the sufficiency of the independent evidence is without merit. The Government presented extensive evidence, independent of the coconspirators' declarations, to connect both Bonomo and Pini to the conspiracy. According to Roy Morrell's testimony, both men attended the Thursday night meeting at the Pier House, at which Van Zandt described the burglary plans and outlined each participant's role. Morrell also placed the two at the Audubon House on the night of the theft. In addition, he related that Bonomo, after walking away from Audubon House, told him, "I've done my job, now the others will have to do theirs." Furthermore, Morrell recalled that Bonomo, who had departed the scene after performing his designated task, drove up on a moped later and asked him, "What's going on?" [14] Finally, Morrell testified that he saw Pini take a crowbar from the back seat of the lookout automobile and walk toward the Audubon House. Morrell saw Pini come back to the car, heard him explain that the crowbar was too large for its intended purpose and say that a screwdriver was needed,[15] saw him drive off with Van Zandt and watched him return shortly thereafter and head back for the building.

14. These two statements are independent, non-hearsay evidence admissible to establish Bonomo's connection to the conspiracy, since each remark qualifies as an admission by a party-opponent under Federal Rule of Evidence 801(d)(2), which includes among "[s]tatements which are not hearsay" a "statement . . . offered against a party . . . [that] is . . his own statement, in either his individual or a representative capacity." Bonomo concedes on appeal that Morrell's testimony regarding these remarks constitutes independent evidence of his connection to the conspiracy.

15. Like the statements attributed to Bonomo, *see* note 14 *supra,* Pini's alleged remarks as to the need for a new burglary tool qualify as independent, nonhearsay evidence connecting him to the conspiracy. See Fed.R.Evid. 801(d)(2)(A). Pini also concedes on appeal that Morrell's testimony regarding these remarks constitutes independent evidence of his connection to the conspiracy.

The foregoing constitutes ample independent evidence connecting both Pini and Bonomo to the conspiracy. Therefore, the lower court committed no error in allowing the jury to consider the declarations of their coconspirators.

### 1. The District Court's Instructions

Nevertheless, appellants contend that the district judge violated the mandate of *United States v. Apollo*, 5 Cir., 1973, 476 F.2d 156, with his instruction to the jury regarding the admissibility of those declarations. Under *Apollo*, "in a conspiracy case in which extrajudicial statements of alleged co-conspirators are proffered," the trial judge must "give a cautionary instruction on the limited uses of hearsay testimony, explaining clearly to the jury the requirement that the conspiracy itself and each defendant's participation in it must be established by independent non-hearsay evidence which must be given either prior to the introduction of any evidence or immediately upon the first instance of such hearsay testimony." *Id.* at 163. During a break in Morrell's testimony, before the Government's first introduction of any declarations by alleged coconspirators, the judge delivered such an instruction and he repeated a similar charge at the end of the trial. However, Pini and Bonomo argue that the judge committed reversible error by failing explicitly to inform the jurors that the existence of the conspiracy and the involvement of each defendant had to be established by independent evidence before they could permissibly consider the statements of coconspirators.

■ Because neither appellant raised any objection at trial to these instructions, as required by Fed.R.Crim.P. 30, on appeal it is not enough that the challenged instructions are erroneous—we must look instead for plain error. *United States v. Brasseaux*, 5 Cir., 1975, 509 F.2d 157, 161; *United States v. Smith*, 5 Cir., 1974, 502 F.2d 1250, 1256, n.9. "The essential question" in deciding a claim of plain error related to jury instructions "is whether this contested part of the charge is so erroneous that

when considered in the totality of the charge as a whole and the evidence presented against each appellant, the error is so great as to result in the likelihood of a grave miscarriage of justice." *United States v. Smith, supra*, 502 F.2d at 1256. Here, after thoroughly considering "the context of the entire charge," *United States v. Brasseaux, supra*, 509 F.2d at 162, we find no probability of great injustice. Moreover, as this court observed in *United States v. Baldarrama*, 5 Cir., 1978, 566 F.2d 560, "[t]he reason for the insistence on cautionary instructions at the time of admission is the fear that without such instructions the hearsay declarations will bootstrap proof of the existence of the conspiracy when independent evidence of the conspiracy is the condition of the use of the declarations at trial. There is no plain error or any possibility of prejudice from such bootstrapping [where] . . . there was sufficient independent evidence of conspiracy." *Id.* at 570.

### C. The Lower Court's Refusal to Give a Requested Instruction

■ During the charge conference, Bonomo's lawyer asked the trial judge to instruct the jury that "if a jury finds that any of the defendants participated in one act only, the breaking and entering, if . . . that was all the part they played in it, the jury must find them not guilty." Counsel renewed his request after the jury retired to deliberate, seeking an instruction that "if the jury finds that the part Bonomo played was merely to rob or burglarize the Audubon House, that, in and of itself . . . has no bearing in the case unless the Government proves beyond a reasonable doubt the defendants conspired and planned . . . that these books were to be taken across the state line." On both occasions, the district judge refused to deliver the requested instruction; Pini and Bonomo now urge that he thereby committed reversible error. The jury charge proposed by Bonomo's attorney misstated the law with regard to both the substantive crime and the conspiracy offense. Since a party

is not entitled to a jury instruction "contain[ing] an erroneous statement of law," *United States v. Deaton*, 5 Cir., 1972, 468 F.2d 541, 545, the lower court committed no error in declining to give the requested charge.

### D. Impeachment of a Codefendant

Relying on *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975) and similar decisions, appellants Pini and Bonomo contend that the lower court erred in allowing the Government to impeach codefendant Jones by referring to his prior silence regarding his alleged involvement in the theft. In his direct testimony, Jones denied any participation in the conspiracy or actual burglary and claimed never to have seen either Bonomo or Pini before the trial began. On cross-examination, the Government asked Jones, "Why did you wait until now to make this statement?" and "Why didn't you go to the police or the FBI or to the United States Attorney?"

■■■ As the district judge recognized, such questions would be improper if aimed at revealing a defendant's prior invocation of his constitutional right to silence.[16] However, in this case Jones' "silence was in no way at issue." *United States v. Mireles*, 5 Cir., 1978, 570 F.2d 1287, 1293. According to the later testimony of an FBI agent, during the investigation of the theft, before his own arrest, Jones had made photographic identifications of several suspected participants, including Bonomo and Pini. Thus, "the prosecutor's questions . . . were not an impeachment by silence, as in *Doyle*, but merely" the beginnings of "an effort to impeach by prior statements that were inconsistent with defendant's testimony at trial." *United States v. Mireles, supra*, 570 F.2d at 1293; *United States v. Berdick*, 5 Cir., 1977, 555 F.2d 1329, 1330–31, cert. denied, 434 U.S. 1010, 98 S.Ct. 721, 54 L.Ed.2d 753 (1978).

### E. The Trial Judge's Allegedly Prejudicial Remarks

■■■ Pini and Bonomo further assert that the district judge, through a series of prejudicial comments during the proceedings below, denied appellants their right to a fair trial. The judge made his first allegedly damaging remark as the jury was being empanelled. He asked the jurors whether "any of you or any members of your family . . . [have] been the victim of a crime," and upon receiving a negative answer responded, "[y]ou sure are a bunch of lucky people." We view this statement as "innocuous" and lacking in any likely prejudicial effect. *United States v. Middleton*, 5 Cir., 1972, 458 F.2d 482. Our reading of the transcript convinces us that the judge's second allegedly prejudicial comment, suggesting that defense counsel was "wasting important time" since "[e]verybody knows that the place was robbed; everybody knows those are the prints that were taken from the place," "was made out of the hearing of the jury," and therefore could not have prejudiced appellants' case. *United States v. King*, 5 Cir., 1976, 532 F.2d 505, 509, *cert. denied*, 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327. Pini and Bonomo contend, however, that the judge's most harmful remark came during the Government's rebuttal argument to the jury. The prosecutor urged the jurors to "ask yourselves why the defendants Bonomo and Pini . . . came all the way down from Boston to perform just a break-in in Key West, Florida. They could have done it in Boston." When attorneys for several codefendants objected, the district judge suggested that "I don't think counsel means they could have broken into the Audubon House in Boston, but I think the tenor of his argument is that these gentlemen, from the evidence, possessed enough skill and knowledge to have been able to break into almost any place anywhere they

---

**16.** When Jones' attorney objected to this line of questioning, the judge explained at a side-bar conference that "if he was interviewed and given his rights and he refused to talk, it is completely inadmissible," but that "[i]f he was interviewed and if he made contradictory statements at that time, it is perfectly admissible."

wanted to," and "[w]ith that amplification," overruled the objections. The transcript clearly shows that the trial judge was not expressing his own opinion regarding the evidence or appellants' criminal skills. Rather, he was attempting to clarify for the jury the Government's view of the evidence. It is not error for a judge to try "to render comprehensible" to the jury the arguments of counsel. *United States v. King, supra,* 532 F.2d at 509. Moreover, the district judge cured any potential harm in his remarks by instructing the jury at trial's end that they were "the sole and exclusive judge of the facts," free to disregard entirely any intimation of the court's own opinion as to those facts. *United States v. King, supra,* 532 F.2d at 509; *United States v. Middleton, supra,* 458 F.2d at 483.

### F. The Reference to Pini's Prior Incarceration

■ Finally, appellants Pini and Bonomo contend that the district court committed reversible error in denying the two motions for mistrial made by Pini's counsel during the testimony of Kester Buchanan. When the Government asked Buchanan whether he had "any conversations with Gerald Pini," the witness replied, "Not at this time, no sir. I might add that during the series of this crime or whatever, I never saw Gerald. I met him in Danbury." At that point Pini's lawyer objected and moved for a mistrial; the trial judge overruled the objection and denied the motion. Later, under cross-examination, Buchanan testified that he had been "convicted of interstate theft of a tractor-trailer and tried and sent to Danbury, Connecticut." Pini's attorney then moved again for a mistrial and the court once more denied the motion. Appellants now contend that by eliciting these two remarks from Buchanan, the Government impermissibly referred to Pini's prior felony conviction, creating thereby "the possibility of the jury finding

guilt by association." This contention is unpersuasive for several reasons. First, when Buchanan mentioned having met Pini "in Danbury," he was answering a series of questions regarding a meeting that he had attended several days after the theft and being asked whether he was personally acquainted with the various alleged participants in the crime. Given that context, we think the Government's question went to conversations between Buchanan and Pini during the course of their involvement in the theft and that Buchanan's reference to Danbury came on his own initiative, as an afterthought. Second, the Government did not bring out the fact of Buchanan's own felony conviction and subsequent incarceration in Danbury federal prison; that information was elicited by codefendant Jones' counsel on cross-examination. Finally, a significant amount of time elapsed between Buchanan's remarks, making it unlikely that the jury would first connect the two isolated statements and then draw adverse conclusions regarding Pini's guilt in the instant case. Accordingly, we reject this final assertion of error and affirm the convictions of Bonomo and Pini on both counts.

### III. Appellant Franklin

After a thorough review of the record, we find the evidence insufficient to sustain the convictions of Gordon Franklin on either the substantive charge or the conspiracy offense.

■ Morrell testified that on the morning after the burglary, at Van Zandt's behest he drove to the warehouse where the stolen prints were stored and asked Franklin "if everything was okay"; Morrell reported that Franklin simply replied "yes." According to Buchanan's testimony, on the Monday following the theft Franklin helped load the folios, wrapped in green plastic, into the trunk of Buchanan's car. Considering this evidence [17] and "all reasonable

---

17. On appeal, the Government also urges that Franklin was implicated by Morrell's testimony to the effect that the proceeds from any sale of the folios would be divided seven ways. The Government includes Franklin as one of the seven who would share. However, Morrell did not list Franklin among those whom he understood would receive a portion of the profits. Instead, Morrell identified himself, Van Zandt, Pini, Bonomo, Buchanan, Collaro and Jones as those he expected to receive a share.

inferences flowing therefrom in the light most favorable to the government," we do not believe that "a reasonably-minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Warner, supra*, 441 F.2d at 821. Neither Morrell's query nor Franklin's response on the morning after the theft proves knowledge on Franklin's part that the burglary had occurred or that the warehouse where he worked was harboring the stolen prints. Similarly, though Buchanan testified that Franklin helped load the stolen art into the trunk of Buchanan's automobile, he also stated that the folios were wrapped in such a way that one could not know what they were without being told, and said that Franklin never indicated being aware of the contents of the packages. The Government presented no evidence that Franklin wrapped the folios, was told what the packages contained, or otherwise knew that the contents were stolen. Thus, it failed to establish with respect to Franklin the essential elements of a substantive violation of section 2314.

Further, according to Morrell, Franklin did not attend the meeting at the Pier House and his name and alleged role in the conspiracy were not discussed on that occasion. The Government describes numerous inferences that it contends the jury might reasonably have drawn to decide "from the competent evidence, the detailed nature of the enterprise and the overall conduct of the crime that Van Zandt had pre-arranged with Franklin to receive the books from Jones and store them until Buchanan picked them up two days later." However, "[c]harges of conspiracy are not to be made out" merely by reliance on such an extended chain of inferences. *Causey v. United States*, 5 Cir., 1965, 352 F.2d 203, 207. We conclude that "a reasonably-minded jury" could not have accepted the evidence presented as sufficient to connect Franklin to the conspiracy. *United States v. Warner, supra*, 441 F.2d at 825.

Therefore, we reverse the convictions of Gordon Franklin under both counts of the indictment and order the charges against him dismissed.

AFFIRMED as to defendants Pini and Bonomo.

REVERSED as to defendant Franklin.